**ASSOCIATION OF FLIGHT ATTENDANTS, AFL–CIO, Plaintiff–Appellee,**

v.

**UNITED AIRLINES, INC., Defendant–Appellant.**

No. 2213, Docket 92–7758.

United States Court of Appeals, Second Circuit.

Argued Aug. 11, 1992.

Decided Sept. 29, 1992.

Robert A. Siegel, New York City (Tom A. Jerman, Jeffrey I. Kohn, O'Melveny & Myers, of counsel), for defendant-appellant.

Peter Herman, New York City (Stephen B. Moldof, Michael L. Winston, Cohen, Weiss and Simon, of counsel), for plaintiff-appellee.

Before WINTER, MINER and McLAUGHLIN, Circuit Judges.

WINTER, Circuit Judge:

United Airlines, Inc. appeals from Judge Sifton's grant of a preliminary injunction barring United from staffing its new domicile, or home base for flight attendants, in Paris, France, unless United obtains visas from the French government for all interested senior flight attendants, 794 F.Supp. 324 (E.D.N.Y.1992). Because United's acts were arguably justified under the collective bargaining agreement, we reverse.

## BACKGROUND

This dispute arises out of United's attempt to staff a new domicile in Paris for 195 flight attendants. United was allegedly advised by its French counsel that the level of French unemployment would preclude a request for an unlimited number of visas. United claims that it also expected that requests by current flight attendants to relocate in Paris would be less than 195. Purportedly based on these considerations and its experience with its recently-opened London domicile, United requested and received seventy-five preapproved visas. United advertised the new positions several times, warning that Parisian-based attendants must comply with immigration requirements.

The response to the advertisements greatly exceeded the number of visas United had obtained in part, United claims, because the Association of Flight Attendants, AFL–CIO ("AFA") encouraged attendants to apply whether or not they desired the position. United granted the seventy-five visas in its possession to the most senior applicants. Another thirty-five were given positions because they possessed or acquired legal rights to work in the European community. Thus, only 110 of the applicants were legally able to work at the new domicile, and United deemed the remaining applicants to be unqualified. It then hired

eighty-five new flight attendants eligible to work in France.

The result benefited United because the eighty-five new hires were presumably "foreign language qualified" flight attendants. United has been dissatisfied with a restriction in the collective agreement on its ability to designate outside the seniority provision the number of "foreign language qualified" flight attendants on each flight. By establishing a domicile with a large percentage of "foreign language qualified" attendants, the contractual restrictions necessarily have less effect.

Alleging that United violated the seniority provisions of the collective agreement in failing to hire those senior applicants lacking the requisite French visas, the AFA commenced the instant action and sought a preliminary injunction prohibiting the staffing of the Paris domicile with newly hired employees. The gravamen of the AFA's complaint was that United had unilaterally altered the seniority provisions of the collective agreement, thus creating a "major dispute" under the Railway Labor Act. 45 U.S.C. §§ 151 *et seq.* (1988).[1] United argued in defense that the dispute was a "minor dispute" within the exclusive jurisdiction of the System Board of Adjustment because there was a legitimate disagreement as to the meaning of the collective agreement.

Although Judge Sifton agreed with United on the main contractual issues, he held that United's actions were taken in bad faith. He concluded that United's contractual arguments would "be substantial and non-frivolous if ... United has done ... nothing more than treat the obtaining of French work permits or visas as one of the qualifications of being awarded a bid.... [Such a position] is, at the least, arguabl[y] ... a justified interpretation of the contract's provisions with respect to qualifications...." He further stated that "neither the terms of the contract nor the past history of dealings between the parties points so clearly in one direction that United's justifications for what it says it has

done can be rejected as frivolous or insubstantial."

Nevertheless, Judge Sifton characterized the dispute as "major" because of United's "bad faith" and "purposeful manipulation of an otherwise valid contract term." The manipulation in question was United's "us[e of] the qualifications issue to mask its disregard for the seniority list....." The core of his holding was that, "[b]y agreeing unilaterally with French authorities that 75 visas would serve its purposes, United has effectively compromised the ability of flight attendants proceeding on their own to obtain additional visas. Colloquially speaking, United has 'poisoned the well.'" He concluded that the AFA "will likely succeed on the merits in persuading a finder of fact that," and "the company is unlikely to prevail on the merits of" whether United interfered with the ability of individual flight attendants to secure visas from the French government. He then enjoined United from filling any vacancies in the Paris domicile until every flight attendant eligible by seniority for such a position has obtained a work permit.

## DISCUSSION

■ As noted, this appeal involves the oft-litigated issue of whether a disagreement is a "major dispute" under the Railway Labor Act—one involving a unilateral and enjoinable change in the collective agreement, *see* 45 U.S.C. §§ 152 Seventh, 156—or a "minor dispute"—one involving a legitimate disagreement over an ambiguity in a collective agreement within the exclusive jurisdiction of the System Board of Adjustment. *See* 45 U.S.C. §§ 152 Sixth, 153 First (i). If the former, United may be enjoined from carrying out its plans; if the latter, United may carry out its plans subject to a ruling on the merits by the System Board of Adjustment, which has exclusive jurisdiction over minor disputes, as to the permissibility of those plans under the collective agreement. *See Consolidated Rail Corp. v. Railway Labor Executives' Ass'n ("Conrail"),* 491 U.S. 299, 302–04, 109 S.Ct. 2477, 2479–81, 105 L.Ed.2d 250 (1989);

---

**1.** The Railway Labor Act governs the airline  industry pursuant to 45 U.S.C. § 181 (1988).

Baylis v. Marriott Corp., *843 F.2d 658, 662 (2d Cir.1988).*

In *Conrail,* the Supreme Court stated that the employer has a " 'relatively light burden' ... in establishing exclusive arbitral jurisdiction under the RLA." 491 U.S. at 307, 109 S.Ct. at 2482 (quoting *Brotherhood of Maintenance of Way Employees & Lodge 16 v. Burlington N. R.R.,* 802 F.2d 1016, 1022 (8th Cir.1986)). That burden is to show that "the action is arguably justified by the terms of the parties' collective-bargaining agreement." *Id.* To meet the "arguably justified" test, an employer need demonstrate only that a reasonable trier of fact could adopt the employer's view of the contract. On the other hand, the union may attempt to characterize the dispute as "major" by establishing that the employer's contractual argument is "obviously insubstantial or frivolous, [or] made in bad faith." *Id.* at 310, 109 S.Ct. at 2484. In essence, the court must conclude that any reasonable trier of fact would find virtually as a matter of law that the employer has violated the contract.

■ Judge Sifton found, and we agree, that United was: (i) arguably entitled to establish new domiciles in foreign countries;[2] (ii) arguably entitled to treat the possession of a visa as a qualification necessary to a flight attendant's exercise of seniority rights;[3] and (iii) arguably not obligated to obtain any visas for flight attendants desiring to relocate to Paris. Indeed, as to each of these matters, the agreement is at best ambiguous. There is no provision limiting the establishment of new domiciles; the view that a legal right to work in a particular foreign country is a qualification for working there is certainly within the realm of reason; there is no express provision suggesting that United must obtain visas for flight attendants desiring to relocate to a foreign domicile. *See supra* note 3.

Although these findings seem dispositive, the district court found that United had acted in "bad faith," *see Conrail,* 491 U.S. at 310, 109 S.Ct. at 2484, by interfering with the flight attendants' ability to obtain French visas. Such interference purportedly circumvented the seniority clause's limitations on United's power to designate the number of "foreign language qualified" flight attendants on each flight. It is not entirely clear that the district court applied the correct test because, as quoted above, it found only that the AFA "will likely succeed on the merits in persuading a finder of fact" and that United "is unlikely to prevail on the merits." The fact that a party is likely to persuade a trier or to prevail does not preclude the existence of a legitimate dispute. Under *Conrail,* the test on a motion for a preliminary injunction is the likelihood that the AFA will prevail virtually as a matter of law. We conclude that such a likelihood has not been shown.

■ We may assume that the seniority clause implies a duty on United's part not to take affirmative steps to decrease the number of visas available to flight attendants seeking to exercise their seniority rights to relocate in Paris. However, United is arguably free to create new foreign domiciles without seeking the issuance of any visas, leaving the flight attendants to

---

2. Ink has been spilled over the effect on the instant matter of United's past practices in designating new foreign domiciles. There is only one such instance: the opening of a London domicile. In that case, United secured a limited number of visas that turned out to be adequate for the number of applicants. One instance hardly establishes an industrial practice governing all future foreign domiciles. Moreover, the London experience is ambiguous as a precedent because it involved a limited but eventually adequate number of visas.

3. Section 12.C.3 of the collective agreement provides in pertinent part:

> Local management shall monitor International Operation trips and arrange visas as required. An International Operation with frequent trips to particular visa-requiring countries may specify a required visa qualification at their location.

The AFA argues that this provision obligated United to obtain the visas required to staff the Paris domicile according to seniority. Judge Sifton held, however, that this provision requires United to procure visas only for individual trips, rather than for flight attendants to live and work in a foreign country. This interpretation is certainly arguable.

secure visas on their own. The question, then, is whether the record establishes as a matter of law, or virtually so, that United's actions prevented some otherwise eligible flight attendants from obtaining a visa. It does not. Principally, there is no evidence that, had United failed to seek visas, flight attendants would have been able to secure visas in any number. Because United was opening a domicile that would lead to the hiring of French nationals, it had leverage to be used in bargaining with the French government. The collective agreement, however, arguably did not oblige United to use that leverage, much less to insist on a sufficient number of visas to accommodate all those who desired to relocate. Being arguably free to seek no visas, the obtaining of seventy-five was not an act of bad faith absent some evidence that the French government had been willing to grant as many as necessary to accommodate the eligible flight attendants desiring to relocate to Paris and that United induced that government to limit the number to seventy-five. For all we can discern from this record, if United had stood mute, the French government would have issued no visas to individual flight attendants. There was thus no proof of a well to poison.

We hasten to add that a tribunal might reasonably find for the AFA. The limitation in the collective agreement on the number of "foreign language qualified" flight attendants that can be designated outside regular seniority might be interpreted by a trier to prevent the designation of a new domicile solely to circumvent that restriction. A trier might also reasonably find that United designated Paris solely for that reason and thus violated the collective agreement. Neither this interpretation of the collective agreement nor the necessary factual finding as to United's intent is inexorable, however, and the dispute is within the exclusive jurisdiction of the Board of System Adjustment.

We therefore reverse.